477 So.2d 242 (1985)
STATE FARM FIRE AND CASUALTY COMPANY
v.
Robert C. SIMPSON and Gloria J. Simpson.
No. 54606.
Supreme Court of Mississippi.
August 14, 1985.
Rehearing Denied October 2, 1985.
*244 Harry R. Allen, Gail A. Crowell, Bryan, Nelson, Allen, Schroeder & Cobb, Gulfport, for appellant.
C.R. McRae, Henry P. Pate, Pascagoula, Alfred Felder, McComb, for appellee.
Before PATTERSON, C.J., and SULLIVAN and ANDERSON, JJ.
PATTERSON, Chief Justice, for the court:
This is an appeal by State Farm Fire & Casualty Insurance Co. from a judgment of the Circuit Court of Jackson County pursuant to a fire loss. There a jury verdict favored Robert and Gloria Simpson in the sum of $22,876.25 as an award due under a policy of insurance issued to them by State Farm Fire & Casualty Co. (hereinafter State Farm). Additionally there was an award of $227,123.75 as compensatory damages and an award of punitive damages of $250,000.00. Following the verdict the trial court authorized a remittitur of $50,000.00 on the compensatory damage award and cancelled a mortgage of the Simpsons to Kimbrough Investment Company on the destroyed property.
State Farm urges numerous assignments of error which will be mentioned as required throughout the opinion. The Simpsons have cross-appealed contending the remittitur offered by the trial judge was improper.

BASIC FACTS
On August 12, 1977, Rex Foster, a State Farm Agent, received Robert Simpson's application for homeowners insurance on his residence in Gautier, Mississippi. The ensuing policy of insurance provided for coverage of $28,000.00 on Simpson's dwelling, $14,000.00 on the contents, and $6,140.00 for additional living expense. Four days before the fire which occurred on Wednesday, August 16, 1978, the Simpsons received notice of an automatic increase in coverage to $30,700.00 for the dwelling and $15,350.00 for the contents with notice of increased premium.
According to Simpson the fire was discovered when he and his family were returning at about 5:00 o'clock a.m. from a visit to the home of his sister, Mrs. Delores Freeman. A neighbor stated the firemen arrived at the scene approximately 13 minutes after their notification. At that time the structure was engulfed in flames and could not be saved. The house and contents were a total loss. Within two days following the fire State Farm advanced the Simpsons $1500.00 in additional living expenses and three days thereafter the Simpsons moved to Tuscaloosa, Alabama, to live in Robert Simpson, Sr.'s trailer park.

THE FIRE SCENE INVESTIGATION
Oren Haddock, a local State Farm Claims Representative, investigated the scene but could not determine the cause of the fire. Upon consulting with George Johnson, his supervisor, Haddock enlisted the aid of Systems Engineering Associates (hereinafter SEA) of Atlanta, Georgia, to investigate and determine the fire's origin.
On September 6, 1978, State Farm was given the report of SEA prepared by Phil Hampton, the cause and origin expert of SEA. This report had been reviewed and approved by Chief Fire Investigator Donald Zwick, an experienced fire investigator who qualified as an expert in this field. At the time he was in the employment of SEA but is now an independent investigator. Their report was well illustrated with a number of photographs supporting their determinations. The report concluded:
A flammable liquid burn pattern was uncovered in the dining room and was traced to the front door. A separate flammable liquid burn pattern was located on the kitchen floor in front of the appliances and originating from the built-in cabinet area. The blistering of the linoleum is a clear indication of an abnormally hot substance burned on top of the surface. The floor fire was so intense on *245 the living room floor that the concrete spalled. There was no connection between the two floor burn patterns on the linoleum floor shared by the dining room and kitchen. The burning to the inner side of the front door indicated the liquid was spread to the front door and then ignited. Based on the observations and analysis contained herein Systems Engineering Associates is of the opinion that the August 16, 1978 fire at the residence of Mr. Robert C. Simpson, Gautier, Mississippi was an intentional incendiary act by a person unknown. It is further the opinion of Systems Engineering Associates that a flammable liquid was poured on the kitchen, dining room, and living room floors to accelerate the fire. All accidental causes were considered and eliminated.
On September 12, 1978, State Farm received an accelerant identification chemical analysis report from the SEA laboratories. The conclusion stated in it follows in pertinent part:
It is the opinion of the chemical laboratory of SEA Investigations Division, Inc., that no hydrocarbon accelerant was isolated from Exhibit One (1). The chemical residues of low volatility isolated from Exhibit One (1) and the comparison sample, Exhibit Two (2) were found to compare favorably with each other. Therefore the chemical residue isolated from Exhibit One (1) is not foreign.
The fact that no hydrocarbon accelerant was isolated can be interpreted by one of two ways: (1) a hydrocarbon accelerant was never present in the debris or (2) a hydrocarbon accelerant was present in the fire debris, at one time, but due to the small amount used or the intense heat of the fire, it has all been consumed.
State Deputy Fire Marshall Norman Cowart investigated the fire scene on September 18, 1978. His report largely confirms SEA's findings that the fire was started by use of a flammable liquid which seemed to have been poured in a trail from the front door to the dining room and hall area of the house. We observe the formal report was completed in early 1979, subsequent to State Farm's denial of the Simpsons' claim on November 21, 1978. However, there is some indication that State Farm had knowledge of the contents of the report before it denied the claim. The appellee disputes this and contends the contents of the report were unknown to the appellant until after the claim was denied. The record is uncertain on this point, leaving it in some doubt.

THE SWORN STATEMENTS
After receiving the SEA report State Farm concluded that sworn statements should be required as authorized by the policy. The statements of the Simpsons were taken on October 6, 1978, in Tuscaloosa, Alabama. Initially it need be noted there was no evidence in any of the reports of a break-in, and the Simpsons stated the doors to their residence were locked and no appliances were on when they left the house prior to the fire.
Simpson stated that when he returned home from work on Tuesday evening before the fire, the family decided to attend a movie. Upon leaving the movie around 11:30 or 12:00 p.m., they went to the home of his sister, Mrs. Delores Freeman. When they arrived only his sister was at home and, instead of going dancing as suggested by Gloria Simpson, they remained with Delores until her husband, Larry, arrived from his shift at Ingalls Shipyard about 12:30 a.m. They drank a six pack of beer and visited until 3:00 a.m., when the Simpsons went to a restaurant for breakfast leaving their sleeping children with the Freemans. They returned around 4:30 a.m. when Mrs. Freeman was to arise for her day's work beginning at 5:30 a.m.
Simpson also related that Glenn Reed, a real estate salesman, listed his house for sale in late 1978, and although Reed located a buyer Simpson decided not to sell because the sale was inconveniently close to the beginning of the new school year and would net only approximately $1500.00. Simpson denied he had ever told anyone *246 that he was considering moving to Alabama and denied any of the contents of the house were removed before the fire.
As to his finances, Simpson stated he had a truck loan payment of $106.00 per month, a personal loan with monthly payments of $97.00 per month and a house payment of $250.00  $300.00 per month. At the time of the fire he acknowledged employment as a stock boy in a grocery store. He and his wife earned some income in their part-time employment as a musician and baby-sitter, respectively. Simpson emphatically denied an awareness of the cause of the fire.
The statement of Gloria Simpson was retaken on October 24, 1978, after the court reporter lost the notes of her previous statement. Her account paralleled that of her husband's except she placed the time of return from the restaurant to the Freemans' home at slight variance from that of her husband. She also related that it took approximately 13 minutes for the firemen to arrive at their flaming home from the time the fire was discovered. She was positive that neither she nor her husband had discussed moving to Alabama with anyone prior to their removal. As to finances, she stated that part of the personal loan made by her husband was to bring current three past due house payments.

UNSWORN STATEMENTS
Oren Haddock of State Farm obtained an unsworn transcribed statement from Mrs. Delores Freeman, Robert Simpson's sister, on October 6, 1978. She stated that the Simpsons came by her home about 10:30 or 11:00 p.m. and asked her to keep their children while they went dancing. She agreed and the Simpsons left, returned about 4:30 in the morning for the children and immediately departed. After the Simpsons left to go dancing Mrs. Freeman awaited her husband's return from work, and they retired about 1:00 a.m.[1]
On October 2, 1978, there was a telephone conversation, later transcribed, between Ms. Laurie Cantonwine and State Farm Attorney Harry Allen. The substance of the conversation follows: a friend of Simpson's called "Gurley" told Ms. Cantonwine that Simpson said he burned the house by pouring cooking oil on the stove and kitchen floor. She also stated that "Gurley" told her that Simpson had to restart the fire several times before it began burning well and that he had nearly suffocated in the house because he stayed inside too long. This statement was repeated in a deposition on January 29, 1980.
Oren Haddock of State Farm took a statement of Glenn Reed, a real estate salesman, on October 12, 1978. Reed related that Simpson told him the reason he wanted to sell the house was that he had secured a job in Alabama and desired to make a quick sale so he could move and enroll his children in their new school. Reed found a buyer for the house in July 1978, but a sale would have netted Simpson only $1,000.00 to $1,500.00. Because of this and that it came too late for convenient school enrollment, Simpson declined to accept the offer.
Mary Murphy, a neighbor of the Simpsons and a real estate broker, gave her statement to Oren Haddock on October 26, 1978. She related the reason Simpson wanted to sell his house was that he desired to return to Alabama. He asked Mrs. Murphy to list his house for sale.
Robert Auth was one of the first firemen on the scene of the fire. When questioned by Haddock, he responded the fire was suspicious because the whole house was engulfed in flames, while a house ordinarily burned at one end or at a certain area and usually was not speedily and entirely covered in flames. He stated further that Simpson told him he was at home about an hour before the fire, that he had left to *247 take his baby-sitter home and upon returning found the house was on fire.
The statement of Clay Ellison, a neighbor, appears in a State Farm Claims Committee report dated November 7, 1978. It indicates he told a State Farm agent that he awakened at 5:00 o'clock the morning of the fire. When he went outside to watch the house burn, Simpson told him he barely had time to get his family out of the house after the smoke awakened him. Ellison thought this unusual because Simpson was fully dressed at the time.

DENIAL OF CLAIM AND LITIGATION PRIOR TO THIS SUIT
State Farm rejected the Simpsons' proof of loss and denied the proceeds of the policy on November 21, 1978. The next day State Farm filed suit for declaratory judgment in the United States District Court seeking a determination of its liability, if any, under the policy. In it State Farm alleged the fire was caused by an incendiary act on the part of the insured. This suit was dismissed without prejudice on May 14, 1979.
On July 19, 1979, the Simpsons filed suit against State Farm in the Circuit Court of Jackson County alleging a breach of the insurance contract in an ex delicto action for bad faith. Other suits and their dismissals followed in both State and Federal Courts finally culminating in this suit which was filed in the Circuit Court of Jackson County on November 13, 1980. In it the plaintiffs designated State Farm Fire & Casualty Co., the defendant, as well as individuals Winston Hankins, General Counsel of State Farm with the responsibility of making final litigation decisions in punitive damage cases; Oren Haddock, George Johnson, and Rex Foster, all agents of State Farm. The Simpsons alleged the defendants were guilty of malicious prosecution, defamation, fraud, breach of fiduciary duty, and intentional infliction of emotional distress, for all of which they demanded redress by way of contractual, compensatory and punitive damages.
State Farm filed a foreclosure proceeding in the state court which was later dismissed. Thereafter State Farm filed its answer denying the allegations of the complaint and asserting the following affirmative defenses:
(1) The subject fire loss was intentionally caused or procured by the plaintiffs and therefore the policy was void ab initio; (2) The plaintiffs violated the policy provisions with respect to increasing the hazard of the subject property and therefore the policy is void; (3) The plaintiffs violated the insurance policy provisions with respect to willful concealments and misrepresentation of material facts and therefore the policy is void; (4) Plaintiffs violated the policy provision with respect to giving false statements under oath and therefore the policy is void; (5) State Farm paid $1500.00 to the plaintiffs for additional living expenses prior to its investigation regarding the facts of the fire and prior to its determination the coverage should be denied; (6) State Farm fullfilled all of its obligations under the policy by paying the mortgagee, Kimbrough Investment Company; (7) State Farm has an absolute privilege as to any pleadings filed in any court and cannot be liable for contents of any pleadings on the grounds of slander and libel.
The counterclaim was filed by the defendant to recover the $1500.00 previously paid to the plaintiffs. With permission of the courts the defendant amended the answer by adding that the claim for punitive damages was barred by the statute of limitations.
Thereafter an order was obtained allowing State Farm to raise the affirmative defense that the allegations of defamation set forth in the declaration were barred by the statute of limitations.
An extensive trial followed, resulting in an appeal to this Court consisting of 23 volumes and more than 3000 pages of testimony, exhibits, instructions, motions, etc., a ponderous legal array indeed. Where *248 possible this opinion will attempt to contain it within reasonable proportions.

PUNITIVE DAMAGES  A BRIEF REVIEW
State Farm contends by assignment of error No. 35 that the trial court erred in granting plaintiff's instruction P-1A on punitive damages. Although the instruction is brought to our attention along with many other assignments of error, it appears to be the core of this suit. However, before responding to it, we think it appropriate to review some of our cases on punitive damages so their decisions and some of the reasons therefor will be unfaded before us when we reach the decisive issues.
Beginning with Hood v. Moffett, 109 Miss. 757, 69 So. 664 (1915), this Court announced the rule on punitive damages to be as follows:
This is a suit for damages alleged to have been sustained because of the breach of a contract, and the rule is, with probably two exceptions, and within neither of which does the case at bar come, that such damages are not recoverable in such an action unless the act or omission constituting the breach of the contract amounts also to the commission of a tort . ..
109 Miss. at 767, 69 So. at 666.
In 1926 in American Ry. Express Co. v. Bailey, 142 Miss. 622, 631, 107 So. 761, 763 (1926), the rule was altered somewhat. We stated:
The general rule is that punitive damages are not recoverable for the breach of a contract, unless the breach is attended by some intentional wrong, insult, abuse, or gross negligence, which amounts to an independent tort.
It is noteworthy that the case continued to state:
While the evidence in the case at bar shows negligence on the part of the forwarding company, it negatives any intentional or willful wrong, or gross negligence, which amounts to the commission of a tort.
142 Miss. at 631, 107 So. at 763.
Later in the case of D.L. Fair Lumber Co. v. Weems, Miss., 15 So.2d 505 (1943), in which both actual and punitive damages were granted by the trial court and were awarded by the jury, we stated the following:
The jury were authorized to and did find punitive damages in the sum of $700. On this point the declaration, proof and instructions thereunder are grounded upon the failure of the lumber company to repair or restore the fence. This proof took the form of letters to the lumber company protesting its failure to rebuild the fence. There is no proof that the original breaking of the fence by Willis was wilful or grossly negligent. The wilfulness complained of was the failure of the lumber company to do what it was not legally obliged to do. Punitive damages were improperly awarded, and the defendants requested instruction to exclude such damages ought to have been given.
15 So.2d at 507-508.
On suggestion of error after a new trial in D.L. Fair Lumber Co. v. Weems, 196 Miss. 201, 16 So.2d 770 (1944), the judgment was modified and affirmed. This Court used the following language in expressing its reason for upholding an award of punitive damages:
Nor may escape be made by the contention that the duty which here was so wilfully and oppressively flouted was one arising by contract and that punitive damages may not be recovered for a mere contract violation. We have held, and now reaffirm it, that punitive damages may be recovered for breach of contract when the breach is attended by such gross negligence or willful wrong as to amount to a tort, [citations omitted] and it needs no authority to sustain the proposition that the breaking down and destruction of another's fence is a tort, and when done under circumstances of such gross and persistent wrong as to manifest an indifference to the consequences and of the rights of others, that *249 it is a tort which will justify punitive damages; and that is what the jury found, and was well supported by the evidence and finding in this case.
196 Miss. at 221-22, 16 So.2d at 773.
We observe elsewhere in D.L. Fair Lumber Co., that the facts before the court on retrial evidenced the willful destruction of three quarters of a mile of plaintiff's fence over his protestations. The punitive award was approved because the intentional wrong was so gross that it merited redress by way of punitive damages.
This selfsame rule was considered in Seals v. St. Regis Paper Company, 236 So.2d 388 (Miss. 1970). There the court considered the propriety of a punitive damage instruction in a suit concerning the striking of a child by an automobile driven by an employee of the defendant company. We stated:
Appellant indicates by his argument that the verdict of the jury should be upheld because under the facts of the case the jury had a right to impose punitive damages. While the evidence relative to the degree of negligence of Smith is stronger on this trial than it was on the first trial, we do not think that this was a case for the imposition of punitive damages. Punitive damages may be recovered for a willful and intentional wrong, or for such gross negligence and reckless negligence as is equivalent to such a wrong. Smith was not guilty of willful or intentional wrong, and we do not think that his course of conduct was such as discloses a reckless indifference to the consequences of his act without any substantial effort to avoid the accident.
236 So.2d at 392.[2]
Continuing in Lincoln Nat. Life Ins. Co. v. Crews, 341 So.2d 1321 (Miss. 1977), this theme moves forward. It holds,
The remainder of the verdict in the amount of $2,308.28 constitutes an award of punitive damages. There is nothing in the record capable of supporting a finding that Lincoln, in defending the suit and relying upon the provisions of the policy, acted other than in good faith. The mere fact that Lincoln rejected the claims under the provisions of its policy and defended the suit and lost does not justify imposition of punitive damages.
Punitive damages are not recoverable for breach of contract unless such breach is attended by some intentional wrong, insult, abuse or gross negligence which amounts to an independent tort. (Citations omitted).
The judgment will be affirmed in the amount of $691.72. It will be reversed and judgment will be entered here for appellant as to the award of punitive damages in the amount of $2,308.28... . (Emphasis added.)
341 So.2d at 1322.
This brings us to Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1978), which reviews the cases mentioned as well as others. In pertinent part it states:
In its second assignment of error defendant contends that this is not a proper case for assessment of punitive damages against it. We recognize that punitive damages are assessed as an example and warning to others and should be allowed only with caution and within narrow limits. In Snowden v. Osborne, 269 So.2d 858 (Miss. 1972), the reason for allowing punitive damages was stated as follows:
Exemplary or punitive damages are those, of course, which are in addition to the actual or compensatory settlement. They are granted in the nature of punishment for the wrongdoing of the defendant and as an example so that others may be deterred from the commission of similar offenses thereby in theory protecting the public. (Citations omitted).
354 So.2d at 247.
In citing with approval other cases, it held:
Further in Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226 (1962), the court held:

*250 In order to warrant the recovery of punitive damages, there must enter into the injury some element of aggression or some coloring of insult, malice or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule. (244 Miss. at 150, 151, 141 So.2d at 233).
With reference to punitive damages in suits for breach of contract we stated in Progressive Casualty Insurance Company v. Keys, 317 So.2d 396 (Miss. 1975) the following:
(b) Punitive damages are not recoverable for the breach of a contract unless such breach is attended by intentional wrong, insult, abuse or such gross negligence as to consist of an independent tort. (Citations omitted). (Emphasis added.)
354 So.2d at 247.
The court's reason for affirming the punitive damage award included the following comment:
Of course, if an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, but in this case the defendant had no reason to contest the claim filed with it. We therefore hold that punitive damages were allowable. 354 So.2d at 248.
The term "arguable reason" is now frequently before the Court. In Blue Cross & Blue Shield of Miss. v. Campbell, 466 So.2d 833 (Miss. 1984), concerning such statement, we held,
We have come to term an insurance carrier which refused to pay a claim when there is no reasonably arguable basis to deny it as acting in "bad faith," and a lawsuit based upon such an arbitrary refusal as a "bad faith" cause of action.
466 So.2d at 842.
The term "arguable reason" does not diminish the rule regarding the resolution of punitive damages because the assessment is no different in "bad faith" cases than in other punitive damages cases. Standard Life v. Veal, supra, provides that punitive damages will not lie if the carrier has an arguable reason for denying the claim. It does not necessarily follow, however, that punitive damages are mandated by the absence of an "arguable reason." This is so because the denial of a claim could be the result of an honest mistake or oversight  ordinary or simple negligence  not reaching the heightened status of an "independent tort" as set out in Veal, supra, and other cases.

THE ISSUE OF PUNITIVE DAMAGES
We are of the opinion the term "legitimate or arguable reason," although spawning much comment in our cases and in briefs and arguments of counsel, is nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to the heightened level of an independent tort. Additionally, the very term expresses the holding of this Court establishing a distinction between ordinary torts, the product of forgetfulness, oversight, or the like; and heightened torts, which are the product of gross, callous or wanton conduct, or, if intentional, are accompanied by fraud or deceit. Lincoln Nat'l. Life Ins. Co., supra.
This is only to say that not all denied claims constitute the gross, wanton or intentional conduct essential to the creation of an independent tort for which punitive damages will lie. "The mere fact that Lincoln rejected the claims under the provisions of its policy and defended the suit and lost does not justify imposition of punitive damages," Lincoln National Life Ins. Co. v. Crews, 341 So.2d at 1322. And see Blue Cross & Blue Shield of Miss. v. Campbell, supra; Bellefonte Ins. Co. v. Griffin, 358 So.2d 387 (Miss. 1978).
In returning to this case we observe the Simpsons' claim was denied on November 21, 1978, within the time frame of the policy. It states in part, "The amount of the loss for which this company may be liable shall be payable sixty (60) days after proof of loss, as herein provided, is received by *251 this company ..." The denial occurred 47 days after the Simpsons' proof of loss and 98 days after the fire according to our computation.
We next consider some of the facts and circumstances State Farm had before it when the claim was denied. In doing so we do not give consideration to the several suits filed in both federal and state courts with varied charges and counter charges leading to allegations of malicious prosecution, abuse of process, etc.[3] primarily because they are subsequent to the claim's denial.
State Farm in deciding to deny the claim of the Simpsons on November 1, 1978, had before it the following items to consider in reaching its decision.
1. The report from Systems Engineering Associates which stated the fire was of incendiary origin.
2. The photographs taken by Systems Engineering Associates which graphically depict the burn pattern.
3. The statement of Clay Ellison that Robert Simpson told him as they watched the flames that he was barely able to get his family out of the house. He thought this unusual because Simpson was fully dressed at the time of the conversation.
4. The statement of Fireman Robert Auth that the house was totally engulfed in flames when he arrived at the scene. He also stated that when firemen arrive quickly after being notified of a burning dwelling, the flames are usually restricted to one area.
Auth further stated that Simpson told him that he was at home about an hour before the fire and left to take his babysitter home and upon returning, found his home in flames.
5. The statement of Laurie Cantonwine that Mr. Gurley told her that Simpson told him that he (Simpson) set the house on fire with cooking oil and went back to watch the end of the movie. (Obviously this is hearsay and not admissible in a court of law. This is not to say that State Farm could not consider it in deciding whether to pay the claim.)
6. The statement of the Simpsons that they never discussed moving to Alabama with anyone. (They did move to Alabama four days after the fire.)
7. The statement of Glenn Reed, realtor, that the Simpsons' house was for sale because the Simpsons desired to move to Alabama.
8. Statement of Mary Murphy, real estate broker and a neighbor of the Simpsons, that Simpson asked her to list their house for sale because they wanted to return to Alabama.
9. Statement of Marcus Barnham, of Kimbrough Investment Company, the Simpsons' mortgagee, that Simpson told him he was considering letting the house go back to the Veterans Administration *252 because he wanted to return to Alabama and work for a relative.
10. The statement of Delores Freeman, Robert Simpson's sister, which was inconsistent to that given by the Simpsons as to their whereabouts on the night of the fire.
In Blue Cross & Blue Shield of Miss. v. Campbell, supra, the court stated:
It can be argued with considerable persuasion that unless the trial judge grants a directed verdict to the insured plaintiff on the contract claim, then, as a matter of law, the insurance carrier has shown reasonably arguable basis to deny the claim; and, therefore, the carrier should never be subjected to the possibility of punitive damages based upon "bad faith".
There is compelling logic behind this argument and this would certainly appear to be true in the vast majority of cases. This criterion should ordinarily determine the answer to the question. 466 So.2d at 843.
In the above case and numerous other cases we have held that when the presentation of all evidence has been completed it is the responsibility and therefore the function of the trial court to determine whether the carrier had an arguable basis, either in fact or in law, to deny the claim. This question, whether an insurer has an arguable reason to deny the claim, is to be passed upon or should be passed upon by the trial court at this stage of the proceeding under the same rules as are applicable in any other jury trial. See Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975), and its progeny.
After reviewing the facts in this case, we conclude the trial court erred when it denied defendant's request for a peremptory instruction on punitive damages and erred in granting a punitive damages instruction. Given the evidence in the light most favorable to the Simpsons, State Farm had an arguable reason to reject the claim at the time it was denied and at all times subsequent thereto. Obviously, if State Farm had an arguable reason to refuse to pay, it must follow that the plaintiff has not presented sufficient evidence to create a jury question on the issue that State Farm was guilty of gross, callous or wanton conduct or intentional conduct accompanied by fraud or deceit.

THE ISSUE CONCERNING COMPENSATORY DAMAGES
State Farm objected to the granting of an instruction on compensatory damages. The instruction follows:
If you find for the plaintiff, you should award damages in an amount that will put the plaintiffs, Robert and Gloria Simpson, in as good a position as they would have been had defendant, State Farm, not failed to fulfill its part of the contract.
In addition to the $22,876.25 previously stated as contract damages, you may award such additional compensatory damages as you find from a preponderance of the evidence including, but not limited to the following:
1. Economic Loss.
2. Litigation Fees and Expenses reasonably incurred in defending the Federal Court cases filed against them.
3. Reasonable compensation for anxiety, worry, anger, indignity, and other mental and emotional distress suffered by the plaintiffs.
No definite standard or method of calculation is prescribed by law by which to fix reasonable compensation for mental and emotional distress. Nor is the opinion of any witness required as to the amount of any such reasonable compensation.
This instruction is not authorized by statute or case law. Additionally, as we comprehend it, the instruction does not require evidence as to some of the damages. Probably it could be reasonably stated this instruction led to compensatory damages in the sum of $227,123.75 (later reduced by a remittitur of $50,000.00). Be that as it may, in Travelers Indemnity Co. v. Wetherbee, 368 So.2d 829 (Miss. 1979), we pretermitted *253 the question of compensatory damages. Therefore, it is not dispositive of the issue here. In Bellefonte Ins. Co. v. Griffin, 358 So.2d 387, 391 (Miss. 1978), we held the following concerning attorney's fees:
As to attorney's fees, the rule in the absence of statute is that they are not recoverable unless the facts are of such gross or willful wrong as to justify the infliction of punitive damages. Cooper v. U.S. Fidelity & Guaranty Co., 186 Miss. 116, 188 So. 6 (1939); Yazoo & M.V.R. Co. v. Consumers' Ice & Power Co., 109 Miss. 43, 67 So. 657 (1915). As there is no applicable statute and because we are of the opinion the trial court did not err in denying punitive damages, it follows that an award of attorney's fees would not have been proper.
The cases cited in support of the above statement, Cooper v. U.S. Fidelity & Guaranty Co., 186 Miss. 116, 188 So. 6 (1939), and Yazoo & M.V.R. Co. v. Consumers' Ice & Power Co., 109 Miss. 43, 67 So. 657 (1915), refer to the denial of attorneys fees in situations in which the facts were neither so gross nor willfully wrong to justify punitive damages, or where punitive damages were not pleaded.
Attorneys fees are sought in this case through instruction P-5 concerning compensatory damages. As noted, this Court has restricted attorneys fees unauthorized by statute to the extreme cases justifying exemplary damages.
Since we have held the present facts do not warrant a punitive damage instruction the award of compensatory damages including attorneys fees was erroneous. In view of this conclusion, the contention on cross-appeal that the trial court erroneously granted a remittitur of $50,000.00 becomes moot.

ACTUAL DAMAGES
As mentioned the jury verdict included a separate award for the amounts authorized by the policy. Although it is true there was abundant evidence that the fire which destroyed the Simpsons' residence was of incendiary origin, there was some proof (developed after the denial of the claim) that it could have been an accidental fire or that the plaintiffs were not responsible for it. The situation was expressed in the following language by the trial court in ruling upon a motion for a judgment notwithstanding the verdict:
Of course, I think the case was hard fought and well tried on both sides. Now, as to the actual damages, that is the value of the insurance policy, I feel, based on the evidence that was submitted to the jury, that the jury could have reasonably found that there was, in fact, no arson, it was an accidental fire. Or in the alternative, they could have found that there was evidence of arson, but that there was insufficient evidence saying that these plaintiffs were associated with it or responsible for it in any way. Under either event, the Plaintiff would have been entitled to the value of the policy. Now, that was a jury issue and I think there was certainly enough evidence that that was a jury question and the jury has resolved that in favor of the Plaintiff.
We are of the opinion the issue of awarding contractual damages under the provisions of the policy was probably for the jury's determination. The greater question, however, is whether the comingling of the issue of contractual damages with that of compensatory and punitive damages prejudicially affected the jury's award. Obviously, the trial court was of the opinion there was evidence to support the two erroneously granted instructions. We are of the opinion the two instructions are the equivalent of a peremptory instruction for the plaintiff on the issue of contractual damages. Since this is so, it seems unquestionable that the jury was prejudicially affected by the instructions. This necessitates a reversal and remand on the issue of contractual damages because of the unusual facts and circumstances of this case.
In our best judgment the preceding conclusions properly decide this case under its *254 facts and our law. However, other words in the nature of obiter dictum seem appropriate. A great majority of punitive damage cases should be ended by the trial court's refusal of a peremptory instruction for the plaintiff. That is to say if the plaintiff is not entitled to a peremptory instruction, it logically follows that a punitive damage instruction should be refused. The refusal of the peremptory instruction indicates there are factual issues to be resolved by a jury and because of this it follows that the alleged tortfeasor has logical reason for denying the claim, thereby prohibiting the granting of a punitive damage instruction.
Unfortunately, in rare cases the defendant's denial of the plaintiff's allegations of bad faith leads to a sharp conflict in evidence necessitating jury resolution so that a peremptory instruction for the plaintiff is out of the question. This circumstance creates a built-in problem prejudicial to the insurer on the issue of contractual damages. This problem comes about because a prerequisite to the award of punitive damages is the determination that the plaintiff is entitled to contractual damages. Miss. Power Co. v. Jones, 369 So.2d 1381 (Miss. 1979); Allen v. Ritter, 235 So.2d 253 (Miss. 1970). The comingling of the two separate issues (punitive damages and policy damages) ordinarily is prejudicial to the defendant because the wealth of the defendant has to be presented to the jury as an essential to appropriate punishment, although financial worth is totally irrelevant to the issue of contractual damages.
In this situation a severance of the two issues, in our opinion, has the potential of preserving just claims for punitive damages as well as safeguarding the alleged tortfeasor's absolute right to a fair trial.
In this suit there is no instruction directing the sequence in which the jury should determine the separate issues. M.R.C.P., Rule 49, on "General Verdicts and Special Verdicts" gives guidance on this subject in the event a severance of the issues is not granted.
M.R.C.P., Rule 42, entitled "Consolidation: Separate Trials" through sub-section (b) authorizes the court to order a separate trial of any claim or separate issue or of any number of claims or issues. The matter is in the sound discretion of the trial court. Obviously the discretion carries with it the responsibility of the trial court, in the event a peremptory instruction cannot be granted for the plaintiff, to grant either a special verdict instruction or separate trials on the different issues so that all parties are assured a fair trial.
AWARD OF PUNITIVE DAMAGES IS REVERSED AND RENDERED; AWARD OF COMPENSATORY DAMAGES IS REVERSED AND RENDERED; AWARD OF CONTRACTUAL DAMAGES IS REVERSED AND REMANDED FOR ANOTHER TRIAL ON THAT ISSUE.
WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
NOTES
[1] After the Simpsons' claim was denied Mrs. Freeman, in a subsequent deposition and at trial, testified that she was mistaken in her first statement to Haddock and changed her prior disclosure to conform to those of the Simpsons. However, at trial she conceded the first statement to Haddock was voluntarily given and was accurately transcribed.
[2] A comparison of this case with D.L. Fair Lumber Co., supra, has importance, we think, inasmuch as the two demonstrate the obvious, i.e., that a punitive damage instruction must be granted or refused on the evidence in each particular case.
[3] November 22, 1978, State Farm filed for declaratory judgment in the Federal Court for the Southern District of Mississippi.

May 14, 1979, Federal Court dismissed the above cause of action.
July 19, 1979, Simpsons filed suit in the Circuit Court of Jackson County and State Farm files counterclaim.
July 14, 1980, Simpsons non-suited the above claim.
November 6, 1980, State Farm filed second cause in the Federal Court of the Southern District of Mississippi seeking foreclosure.
November 7, 1980, State Farm non-suited its counterclaim filed on July 19, 1979, in the Circuit Court of Jackson County.
November 11, 1980, Simpsons filed a second declaration in the Circuit Court of Jackson County.
December 12, 1980, State Farm removed the above case to the Federal Court of the Southern District of Mississippi, and files answer to Simpsons' declaration.
April 21, 1981, The Federal Court of the Southern District of Mississippi consolidated the suits and remanded them to the Circuit Court of Jackson County.
July 30, 1981, State Farm non-suited complaint in the Federal Court seeking a foreclosure.
November 25, 1981, Trial in the Circuit Court of Jackson County began on the suit by the Simpsons against State Farm and State Farm's counterclaim. (This suit with the results mentioned in the opening paragraph.)