523 So.2d 12 (1987)
SOUTHERN NATURAL GAS COMPANY
v.
Joseph F. FRITZ, G.B. "Boots" Smith Corporation, Challenger Deepwell Services, Inc., H. Lanier B. Foote, and Exxon Corporation.
No. 56911.
Supreme Court of Mississippi.
August 5, 1987.
Rehearing Denied April 27, 1988.
*13 R. Wilson Montjoy, II, John M. Grower, C. Victor Welsh, III, Brunini, Grantham, Grower & Hewes, Jackson, Miss., Joseph H. Moss, Jr., John C. Griffin, Birmingham, Ala., for appellant.
Glenn Gates Taylor, James Russell Tucker, Copeland, Cook, Taylor & Bush, Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and SULLIVAN and GRIFFIN, JJ.
ROY NOBLE LEE, Presiding Justice, for the Court:
The Circuit Court of Marion County, Mississippi, sitting without a jury, entered judgment in the amount of one million thirty-two thousand four hundred sixty-seven dollars and sixty cents ($1,032,467.60) in favor of Joseph F. Fritz, et al., against Southern Natural Gas Company [Southern] for breach of contract involving the sale of natural gas. Fritz also sought punitive damages, alleging an intentional, willful and bad faith breach, constituting an intentional and tortious breach of contract. The lower court granted summary judgment in favor of Southern Natural Gas Company as to punitive damages. From the money judgment, Southern has appealed, and Fritz, et al., have cross-appealed from the judgment denying the punitive damages claim and from the amount of the money judgment.
Appellant assigns the following errors in the trial below:
I. THE LOWER COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE RULE 270.207 ISSUE.
II. THE LOWER COURT ERRED IN REFUSING TO STAY THE CASE PENDING REVIEW OF THE RULE 270.207 ISSUE BY THE FEDERAL ENERGY REGULATORY COMMISSION [FERC] PURSUANT TO THE FERC'S PRIMARY JURISDICTION.
III. EVEN IF FRITZ IS ENTITLED TO COLLECT THE DEREGULATED PRICE, HE CANNOT COLLECT IT RETROACTIVELY.
IV. ATTORNEY'S FEES ARE NOT RECOVERABLE WHERE PUNITIVE DAMAGES ARE DISALLOWED.
V. THE LOWER COURT ERRED IN ALLOWING INTEREST CHARGES IN EXCESS OF THE CONTRACT AMOUNT.

Facts
On October 26, 1951, Southern entered into a contract with Humble Oil & Refining Company (now Exxon) for the purchase of gas produced from the Sandy Hook Field in Marion and Pearl River Counties, Mississippi, and Washington Parrish, Louisiana. The contract was amended a number of times by Exxon and Southern, the last being February 5, 1982. The contract amendment involved here was executed October 5, 1979.
Prior to 1978, all gas sold in interstate commerce was subject to federal ceiling price regulation and was referred to as regulated gas. The passage of the Natural Gas Policy Act of 1978 resulted in the lifting of price restrictions on certain categories of natural gas, which was referred to as deregulated gas, while other categories remained regulated. One of the categories which became deregulated as the result of NGPA was "deep, high-cost" gas produced from a depth of below 15,000 feet. That category applies to the well in the present case.
*14 In early 1978, Exxon had discovered gas in the "Mississippi Canyon" area of off-shore Louisiana and Southern submitted a proposal to purchase the gas from Exxon. During the late summer or fall of 1978, Exxon and Southern reached an agreement in principal to upgrade and modernize various contracts and for Exxon to sell its Mississippi Canyon gas to Southern. The amendments upgrading those contracts were executed by Exxon and Southern October 5, 1979. After the amendment occurred, FERC gave notice that it was considering adopting a regulation governing sales of regulated and deregulated gas. The regulation is 18 C.F.R. § 270.207. The purpose of the regulation was to prevent a producer, who was selling both regulated and deregulated gas to a given purchaser, from evading the price ceilings on regulated gas by hiding part of the price he was receiving for regulated gas in the price he was charging the purchaser for deregulated gas.
In January, 1980, Exxon spudded the Sandy Hook gas Unit 27 # 1 (well). Exxon was unable to complete the well as a producer and entered into a farm-out agreement with Fritz. Under its terms, Fritz would earn an assignment of leases from Exxon, if he completed the Sandy Hook well as a productive unit. However, during the drilling operation, the well casing caved and the well cost Fritz an additional five million dollars ($5,000,000), which placed him in dire financial straits. On January 24, 1983, after Fritz completed the well, Exxon executed an assignment to him which was made subject to the Exxon-Southern contract. The agreement stated that Fritz confirm, ratify, and adopt the terms and provisions of the Exxon-Southern contract and assume all rights and obligations of Exxon thereunder as they related to the interest of Fritz committed to the performance of the contract.
In 1979, Exxon and Southern added a favored nations clause[1] to the contract which had the effect of increasing the price payable for deregulated gas. The amendment was agreed to in consideration of the commitment of regulated gas by Exxon to Southern. That regulated gas was subsequently sold to Southern at the maximum lawful price.
Southern takes the position that because of the interstate nature of the transaction involved here, the parties are preemptively regulated by the FERC; that § 270.207 has been interpreted by the FERC to render illegal the payment of a contract price for natural gas under circumstances similar to the present case; and that penalties probably would be inflicted from a violation of § 270.207. Therefore, Southern declined to pay the full contract price, pending a ruling by the FERC that such payment would not constitute illegal activity.
Fritz, on the other hand, claims that under the facts of the case, there is no violation of § 270.207; that refusal by Southern to pay the contract price amounted to a tortious breach of the contract; and that Fritz is entitled to actual damages, incidental and consequential, and punitive damages.

Law
The record in this case comprises twenty-three (23) volumes, and adds to the complexity of the case. However, the issues are relatively simple, except that the two threshold questions relating to the jurisdiction of the FERC are difficult for determination. Southern contends (1) that the lower court erred in granting summary judgment on the § 270.207 issue and (2) that the lower court erred in refusing to stay the case pending review of the § 270.207 issue by the FERC pursuant to the FERC's primary jurisdiction.
*15 The basis of the first two issues is FERC Regulation 270.207, which states:
Section 270.207  Sales of Volumes of Gas Which Include Deregulated High-cost Gas.

No portion of the price paid for the first sale of deregulated, high-cost gas, as defined in Section 272.103, or gas for which an application that the gas qualifies as deregulated high-cost gas is pending, may represent consideration for the sale of natural gas which is not deregulated, high-cost gas.
In considering circumvention of maximum lawful prices, the FERC stated its regulatory analysis of the final rule enacting § 270.207:
The Commission is concerned that situations may arise where prices paid for deregulated gas may be paid as consideration for the sale of gas subject to price regulation... . [W]e do not intend to permit circumvention of applicable maximum lawful prices and would consider sales in which part of the price paid for deregulated high cost gas was paid as compensation for the sale of price regulated gas to be circumventing applicable maximum lawful prices.
Order No. 78, 45 Fed.Reg. 28092 (April 28, 1980), FERC Stat. & Reg. ¶ 30,147.
Southern and Fritz both rely upon Columbia Gas Transmission Corp., 22 FERC ¶ 63,093 (1983). In Columbia, there was a 1963 contract between Exxon and Columbia for the sale of natural gas produced from the Garden City Field. Subsequently, the parties amended the Garden City contract to include a favored nations clause as an alternate pricing mechanism for deregulated gas. Under the agreement, Exxon was entitled to receive the highest price paid by Columbia to any other producer in the Garden City Field. The favored nations clause operated to increase the price paid for deregulated gas above that which would have been paid without the amendment. As consideration for the amendment, Exxon agreed to commit to Columbia certain gas reserves in off-shore Louisiana, the majority of which was regulated gas. This tie-in between the commitment of regulated gas and a deregulated price increase was held to be the practice prescribed by § 270.207. On January 16, 1984, the FERC decided the Columbia case and stated:
[I]n the case where the price of deregulated gas is increased in exchange for new reserves of regulated gas at the ceiling price, the price of the regulated gas exceeds the maximum lawful price because, in consideration for the regulated gas, the producer receives both the ceiling price and additional money for deregulated gas.
26 FERC ¶ 61,034 (1984), at 61,122.
The FERC held that Columbia and Exxon had violated federal law by paying and receiving a high price under the Garden City contract.
While Columbia and the case sub judice are similar, we make a distinction between them.
Columbia:
(1) The 1981 amendment was entered into after § 270.207 was promulgated.
(2) The 1981 amendment provided an alternative pricing formula which increased an existing deregulated price that Columbia Gas was already paying.
(3) At the time of the 1981 amendment, deregulated gas was actually being produced and sold to Columbia Gas under the contract which was amended.
(4) There was no evidence that the increased deregulated price was agreed to as part of a general overall upgrading of all contracts between Exxon and Columbia.
(5) There was no evidence that the increased regulated price was being paid by Columbia Gas to other producers of deregulated gas.
Southern:
(1) The October 5, 1979, amendment of the Sandy Hook contract and all of the Exxon-Southern contracts were entered into before § 270.207 was even published or promulgated. Exxon and Southern reached agreement to modernize and upgrade many of the provisions existing in nine of their contracts (including but not limited to the price provisions) in the *16 summer of 1978, almost a year and a half before § 270.207 was even published.
(2) The October 5, 1979, amendment of the Sandy Hook contract did not increase an existing deregulated price. Prior to the amendment, no deregulated price was payable under the contract. The amendment in fact provided for the first deregulated price which was payable under the contract.
(3) At the time of the October 5, 1979, amendment of the Sandy Hook contract, no deregulated gas was then being produced from the Sandy Hook Field, no gas was then being produced which was subsequently determined to be deregulated gas, and no wells were even drilling for deregulated gas at Sandy Hook. Further, the Exxon Gas Contracts Department in Houston was not aware of any deregulated prospects whatsoever in the entire State of Mississippi.
(4) The amendment of all of the existing Exxon-Southern contracts, including the Sandy Hook contract, occurred as part of the usual and customary practice of periodically upgrading and modernizing contract provisions and long term gas contracts.
(5) The deregulated price which was payable under the October 5, 1979, amendment was the same deregulated price which Southern was then paying and offering to other producers of deregulated gas, and, in some cases, was even less than the deregulated price which Southern was paying and offering other producers for deregulated gas.
(6) The deregulated price which was payable under the Sandy Hook amendment was in some cases less than the deregulated price which Exxon was being offered or being paid by other purchasers elsewhere for deregulated gas which Exxon was selling.
Southern concedes that, except for the § 270.207 rule, the contract is binding upon it. We hold that the lower court did not err in finding there was no violation of § 270.207 and in granting the summary judgment.

II.
Southern contends that the lower court erred in refusing to stay the case pending review of the Rule 270.207 issue by the FERC since the FERC had primary jurisdiction; that the disposition of the issue of Rule 270.207 requires the determination of the FERC, a body with special competence; that primary jurisdiction here safeguards the regulatory interest of administrative agencies by insuring uniformity and consistency in the conduct of regulated businesses; that it enables the courts to consider agency views on relevant policy matters and expert agency findings on factual matters; and it allows a more flexible procedure to be utilized in the resolutions of questions that the judicial process may not be adapted to review. United States v. Western & Pacific Railroad Co., 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952).
Simply stated, primary jurisdiction requires that a determination of an agency such as FERC be made first. Marine Engineers' Beneficial Ass'n v. Interlake Steamship Co., 370 U.S. 173, 82 S.Ct. 1237, 8 L.Ed.2d 418 (1962). The United States Supreme Court ruled in Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Trans-Atlantic, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970):
[W]hen there is a basis for judicial action, independent of agency proceedings, courts may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved.
400 U.S. at 68, 91 S.Ct. at 208.
Southern argues that jurisdiction over the parties is concurrent between the Circuit Court of Marion County and the FERC, but that the FERC has primary jurisdiction over the § 270.207 issue because it is a (1) regulation promulgated by the FERC, (2) the FERC is more qualified than the lower court to apply § 270.207 to the facts of this case and to render a decision which is necessary to the ultimate *17 adjudication of the breach of contract question. At pages 16 and 17 of Southern's brief, it states:
Thus, under General American, the Circuit Court clearly should have "stayed its hand" pending the FERC's determination of the unlawfulness of contract performance. Its failure to do so constitutes reversible error.
* * * * * *
... First, by proceeding on the merits, the Circuit Court clearly disregarded the time and effort that could have been saved had the case been stayed. There is presently an action before the FERC to determine whether § 270.207 would be violated in this case. If the Circuit Court had properly awaited the FERC's decision, the expenditure of much time and money would have been saved not only by the litigants, but also by the courts. Because FERC is not a party to this proceeding, no decision by the Circuit Court will be binding on the FERC. Should the FERC reach a decision contrary to this Court's, the parties would be placed in a dilemma, and would be forced to expend considerable effort, judicial time and money to resolve the conflict, all of which would be avoided by the exercise of primary jurisdiction.

We have carefully considered the briefs and authorities on this question presented by Southern, as well as the response and authorities submitted by Fritz, and we are not persuaded that this cause should be reversed and stayed until the FERC acts.
The record reflects that on June 30, 1983, Southern filed a petition for declaratory order under Rule 207 of the FERC's Rules of Practice & Procedure, requesting a declaration of whether Rule 270.207 prohibits it from paying Fritz and three co-owners a deregulated price for certain natural gas, subject to § 107(c)(1) of the Natural Gas Policy Act of 1978. On January 18, 1984, Southern moved that the FERC expedite consideration of its petition. A proposed order setting the matter for hearing was presented to the FERC and has never been granted or acted upon by the FERC, although four years have expired since the petition was filed. It was also indicated that no other case involving this, or a similar question, has been heard or acted upon by the FERC. Southern states in its brief that Columbia is the only decision relating to the § 270.207 issue. Southern urged that this Court reverse the judgment of the lower court and remand the stay until the FERC acts. At page 20 of its brief, Southern states:
An exception is for the FERC to make if its policy aims allow one. Therefore, this action should have been stayed to give the FERC that opportunity. If the FERC agrees with the Plaintiffs' distinctions and excepts this case from § 270.207, the contract price will be paid without further litigation.

Southern admits it owes the contract price, if there is not a § 270.207 violation and will pay the contract amount without further litigation, if the § 270.207 regulation has not been violated. However, Southern gives no assurance that the FERC will ever act. Entering a stay for the FERC to exercise primary jurisdiction would be the equivalent of sending the case to the graveyard. This Court has no authority to remand the case to the FERC for the exercise of primary jurisdiction. Upon an affirmance of this case, either wholly or partially in favor of Fritz, it is extremely likely that Southern will be able to obtain a decision from the FERC on the § 270.207 violation, through the federal system.
This assignment of error is rejected.

III.
Southern contends that, even if Fritz is entitled to collect the deregulated price, he cannot collect it retroactively.
The deregulated pricing provision in the Exxon-Southern contract by the 1979 amendment states in part:
If at any time during the term of this agreement the Federal Energy Regulatory Commission ... ceases to have or exercise jurisdiction over the price for all or a part of the gas sold under this agreement, the price to be charged for such deregulated gas after the cessation *18 date ... shall be ... the average of the three (3) highest prices... .
18 C.F.R. § 270.101(c)(2) provides that "the price of gas is deregulated only if a determination by a jurisdictional agency that such gas qualified [as deregulated gas] has become final." Federal law requires that the initial determination of whether gas is deregulated shall be made by the state, here, e.g., the State Oil & Gas Board of Mississippi, 15 U.S.C. 3413(c). The determination by the State Oil & Gas Board is then sent to the FERC and becomes final forty-five (45) days after receipt, if FERC takes no action in the meantime. 18 C.F.R. § 275.202. The State Oil & Gas Board made its initial determination on August 18, 1982, that the well qualified as deregulated gas, but it delayed filing the records with the FERC until December 16, 1982. The gas was not finally determined to be deregulated until forty-five (45) later, January 30, 1983, when the FERC took no action. The FERC did not cease to have or exercise jurisdiction over the gas produced from the well until January 30, 1983, under the terms of the contract. The difference between the NGPA § 102 price which Southern paid and the deregulated contract price from the date of first production in August, 1982, until January 30, 1983, amounts to two hundred eighty thousand dollars ($280,000) retroactive collection.
Numbers of contracts contained a retroactive payment clause for the protection of the producer of deregulated gas. Those clauses were included in contracts to cover a situation such as exists here. However, neither the contract here executed by Exxon and Southern and subsequently ratified and adopted by Fritz, nor any amendment, ever provided for retroactive payments and collections of deregulated gas.
We have carefully considered the briefs and arguments of the parties including those of Fritz relating to oral agreement, waiver, statements and discussions about retroactive payments, and estoppel. The record does not support an amendment of the contract, nor did those positions entitle Fritz to retroactive payments for the period involved.
The lower court found that the Natural Gas Policy Act and FERC regulation § 270.207(c)(2) should be interpreted liberally to protect a producer from such inequities as exist here. Fritz[2] was represented by competent counsel during and after he received, ratified and adopted the contract and amendments thereto. Courts cannot write into a contract that which fails to appear, nor can it interpret a contract liberally just to help one party. This Court must decide questions of law, in accordance with the facts, as best it can.
The judgment of the lower court is reversed and rendered as to allowance of the November and December, 1982, and January, 1983, retroactive payments for deregulated gas.

IV.
Appellant contends that attorney's fees are not recoverable in this case, since punitive damages were disallowed. The lower court allowed Fritz one hundred fifty thousand dollars ($150,000) as attorney's fees, stating that
Although the contract is silent on attorney's fees and Mississippi common law does not recognize such damages without there being a punitive damage award, this court does feel that a quasi-bad faith change in the course of dealing by one party should not prove to be a detriment to the other party where there are legal principles which support making the other party whole.
Attorney's fees were not provided for in the contract and they are not recoverable as incidental damages. Grisham v. Hinton, 490 So.2d 1201, 1205-07 (Miss. 1986). In the absence of a statute, attorney's fees are not recoverable unless the facts are of such gross or willful wrong as to justify the infliction of punitive damages. Aetna Casualty & Surety Co. v. Steele, 373 So.2d *19 797 (1979); Cooper v. United States Fidelity & Guaranty Co., 186 Miss. 116, 188 So. 6 (1939). The finding by the lower court of "quasi bad faith" by Southern is not a proper standard for awarding attorney's fees. See Fedders Corp. v. Boatrights, 493 So.2d 301, 311 (Miss. 1986).
The judgment of the lower court is reversed and rendered as to the award of attorney's fees.

V.
Southern complains as error the lower court's action in awarding Fritz ten percent (10%) interest on the amount of the recovery when the contract provided for six percent (6%) interest. The increase in interest by the court was based upon his finding that Fritz could have obtained ten percent (10%) on the money either through the escrow route or other investment procedures. We are of the opinion that the provisions of the contract apply and that only the interest provided in the contract may be recoverable. 22 Am.Jur.2d Damages § 179 (1965); 45 Am.Jur.2d Interest and Usury § 35 (1969).
The judgment of the lower court is reversed and rendered as to interest recoverable, which is reduced to six percent (6%) per annum.

CROSS-APPEAL

I.
On this cross-appeal, Fritz first assigns as error that the lower court erred in granting summary judgment on Fritz's claim for punitive damages on the basis of Southern's tortious breach of the gas purchase contract. Fritz emphasizes his claim for punitive damages on an internal memorandum from Southern setting a meeting to review Southern's right to terminate any of its contracts and to unilaterally reduce the price provided in its contracts. The memo seeks a broad legal ground and asks for the best imaginative thoughts of various executive officers. However, a follow-up memo dated March 15, 1983, stated that Southern should continue to pay the higher prices pending the outcome of any litigation. Legal relief was being sought by Southern. Further:
(1) Columbia Gas Transmission Corp., Docket Nos. TA81-1-21-001, et al., 22 FERC ¶ 63,093 (December 30, 1982), was the only case decided involving the question of the FERC's primary jurisdiction at the time and a reasonable interpretation of the case would indicate that the FERC had primary jurisdiction.
(2) Pennzoil v. FERC, 645 F.2d 360 (5th Cir.1981) had been decided, but a reasonable interpretation and argument as to the holding was that the case was dealing only with deregulated gas and not with a contract involving regulated gas and deregulated gas.
(3) On March 31, 1983, Fritz's attorney wrote Southern demanding that it pay the deregulated contract price. The attorney referred generally to Fritz's poor financial situation and inability to pay his creditors. In response, Southern agreed to pay the highest price which was clearly legal and to escrow the difference between the prices. Southern further offered to discuss with Fritz's creditors committee a method of reducing or eliminating any difference in the interest paid to the creditors and interest accruing on the escrow amounts. The offer was rejected by Fritz and suit was filed shortly for the contract breach.
(4) Southern requested the FERC to rule on the issue involved, which it declined to do. The FERC staff stated that "The language of the contract amendment appears to violate § 270.207" but the FERC declined to adopt its staff's proposed order. It was reasonable for Southern to think that there was a violation of § 270.207.
(5) Southern had reasonable grounds to believe that it was probably in violation of § 270.207 and that severe criminal penalties could be imposed.
This Court is well aware of the principle of law which allows the infliction of punitive damages. Fritz claims that the refusal of Southern to pay the deregulated price for gas was a tortious breach of the contract, which was accompanied by intentional wrong, insult, abuse, or negligence so *20 gross as to constitute an independent tort. State Farm Fire & Cas. Co. v. Simpson, 477 So.2d 242 (Miss. 1985). He cites a number of the recent decisions of this Court involving punitive damages.
We have carefully considered the facts of the case and have again examined our decisions on punitive damages beginning with Standard Life Ins. Co. v. Veal, 354 So.2d 239 (Miss. 1977), and extending through State Farm Fire & Cas. Co. v. Simpson, supra, at least sixteen (16) cases, and we are of the opinion that the facts of this case do not justify punitive damages or come within the standard, which will allow submission of the question to a jury. Therefore, we are of the opinion that the lower court did not err in granting a summary judgment for Southern on punitive damages and the assignment of error is rejected.

II.
Fritz contends that the lower court erred in refusing to award him the full amount of his incidental and consequential damages sustained as a result of Southern's breach of contract. As a practical matter, we have answered this question in the direct appeal wherein we denied the loss of attorney's fees and reduced the ten percent (10%) interest rate granted by the lower court to the contract rate of six percent (6%).
Fritz relies upon the provisions of the Uniform Commercial Code, i.e., § 75-2-709(1), (2), for collection of incidental damages as defined under § 75-2-710. He may not recover for consequential damages under the UCC.
The remedies provided by this code shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the party had fully performed but neither consequential nor special nor penal damages may be had except as specifically provided in this code or by other rule of law.
We are of the opinion that Fritz is not entitled to incidental damages or consequential damages under the Uniform Commercial Code. Petoleo Brasileiro S.A. Petrobras v. Ameropan Oil Corp., 372 F. Supp. 503 (E.D.N.Y. 1974); Aetna Casualty & Surety Co. v. Day, 487 So.2d 830 (Miss. 1986); S.C. Gray, Inc. v. Ford Motor Co., 92 Mich. App. 789, 286 N.W.2d 34 (1979); Brownie's Army & Navy Store, Inc. v. E.J. Burke, Inc., 72 A.D.2d 171, 424 N.Y.S.2d 800 (1980). Likewise, we are of the opinion that Fritz is not entitled to such damages under case law of Mississippi. The assigned error is rejected.
The judgment of the lower court is affirmed in part, reversed and rendered in part, and remanded for compilation of interest and entry of judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART; AND REMANDED.
WALKER, C.J., HAWKINS, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
NOTES
[1] Favored nations clauses are common in the industry and set the price for natural gas based upon other sales of gas in certain areas. In this case, the favored nations clause set the contract price at the average of the three highest prices being paid under contracts between any pipeline and producer anywhere in Mississippi or southern Louisiana. This provision is qualified to exclude purchases by pipelines from their producer affiliates. It also provides a price limit, stating that the price may never increase above the cost of a certain competing fuel, No. 2 fuel oil.
[2] He slept on his rights by not seeing that the Oil & Gas Board order was not filed with FERC until four months after its adoption.