529 So.2d 620 (1988)
LIFE & CASUALTY INS. CO. OF TENNESSEE
v.
Henry Edward BRISTOW.
No. 57393.
Supreme Court of Mississippi.
July 20, 1988.
Rehearing Denied August 10, 1988.
*621 John E. Hughes, III, Wells, Wells, Marble & Hurst, Jackson, William M. Beasley, Mitchell, Voge, Beasley & Corban, Tupelo, for appellant.
John Leroy Long, Roy O. Parker, Tupelo, for appellee.
En Banc.
ANDERSON, Justice, for the Court:
This is an appeal from a jury verdict in the Circuit Court of Lee County in which Henry Edward Bristow was awarded $50,000 in compensatory damages and $6,000,000 in punitive damages for his bad faith claim against Life & Casualty.
In April 1969 the Life & Casualty Insurance Company of Tennessee issued a disability policy to Henry Edward Bristow, an electrician. The part of the policy in controversy here contains the following statement:
Total disability means the complete inability of the insured to perform the duties of his regular occupation, except if indemnities have been paid for 24 months of a continuous disability, then ... "total disability" shall mean the complete inability of the insured to perform the duties of any occupation for which he is reasonably fitted by his education, training and experience... .
On February 11, 1980, Bristow was involved in an accident and broke his left arm. His doctors in Tupelo referred him to Dr. Alan Freeland, an orthopedic specialist at the University Medical Center in Jackson. Although he is right handed, Bristow filed a claim under the disability policy. Life & Casualty determined that Bristow was totally disabled for purposes of his regular occupation, and began issuing benefit checks to him from April 18, 1980. For the next year, Bristow continued to visit Dr. Freeland. By July 30, 1981, the doctor was so pleased with Bristow's progress that he released him from treatment for a period of one year with the understanding that if any problems developed, Bristow would contact him. It is undisputed that Bristow did not make any such complaints. At this time Dr. Freeland stated that Bristow should not resume his regular job as a commercial electrician and that he should not do any work involving standing on a ladder or working with objects overhead.
*622 Meanwhile, Life & Casualty continued to receive periodic reports from Dr. Freeland on the status of Bristow's injury. The 24th payment to Bristow was made in January 1982. By the terms of the policy, further payments were permissible only if the insured was completely unable to perform the duties of any occupation for which he was reasonably fitted. Accordingly, Life & Casualty undertook to review Bristow's file as the deadline approached. Life & Casualty wrote a letter to Dr. Freeland on February 16, 1982, requesting a specific statement as to Bristow's status. Dr. Freeland returned the form, indicating thereon that Bristow was still totally disabled as to his regular occupation, but stating that he was not disabled from other occupations, provided they did not involve heavy manual work, working on ladders, or with overhead objects. After reviewing Bristow's entire file, including this most recent statement by Dr. Freeland, Life & Casualty decided to discontinue the disability benefits and so informed Bristow by letter. Bristow, feeling aggrieved by the decision, consulted a lawyer, who challenged the company's decision. Correspondence in this dispute continued for several months.
In January, 1983, Life & Casualty filed for a declaratory judgment in the Circuit Court of Lee County to determine its obligations under the insurance policy and resolve the dispute. Shortly thereafter in March, Life & Casualty paid Bristow the amount of the disputed benefits and filed an amended complaint asking for declaratory judgment and reimbursement of this amount. Bristow answered with general denials and a counter-claim charging Life & Casualty with bad faith refusal to pay benefits under the policy. He sought $50,000 in damages for emotional distress and $10,000,000 in punitive damages. The case went to trial in the Circuit Court of Lee County, with all issues being submitted to the jury, including punitive damages. The jury returned a verdict in the amount of $50,000 actual damages and $6,000,000 punitive damages. Life & Casualty feeling aggrieved by this judgment has appealed to this Court.

LAW

ASSIGNMENT OF ERROR NO. I: THE ISSUE OF PUNITIVE DAMAGES SHOULD NOT HAVE BEEN SUBMITTED TO THE JURY.
Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed "with caution and within narrow limits." Standard Life Ins. Co. v. Veal, 354 So.2d 239, 247 (Miss. 1978). In the specific context of insurance litigation, this Court has held that "any plaintiff asking for punitive damages or any special or extraordinary damages based on bad faith of an insurance company has a heavy burden." Blue Cross/Blue Shield of Mississippi v. Campbell, 466 So.2d 833, 842 (Miss. 1984).
Whether or not the question of punitive damages goes to the jury is decided by applying a two-step test: (1) there must be a finding that the insurance company had no "legitimate or arguable reason to deny payment of the claim." Reserve Life Ins. Co. v. McGee, 444 So.2d 803, 809 (Miss. 1983); Campbell, supra, 466 So.2d at 842.
A finding that there was no arguable reason for denying the claim does not automatically produce the conclusion that punitive damages issue should be submitted to the jury. As this Court recently noted,
In the absence of an arguable reason, the trial court still must determine whether there is a jury issue as to the insurer's having committed a wilful or malicious wrong, or acted with gross and reckless disregard for the insured's rights. If not, the question of punitive damages should not go to the jury. Pioneer Life Ins. Co. of Illinois v. Moss, 513 So.2d 927, 930 (Miss. 1987).
See also, State Farm Fire & Casualty Co. v. Simpson, 477 So.2d 242, 250 (Miss. 1985). The wrong complained of must not be an "ordinary tort" such as could be "the produce of forgetfulness, oversight or the like," but must be more in the nature of "heightened" tort evincing "gross, callous or wanton conduct, or ... accompanied by fraud and deceit." Simpson, 477 So.2d at 250.
*623 Note that both of these questions are questions of law, to be decided by the trial judge. Pioneer Life, 513 So.2d at 930; Reserve Life, 444 So.2d at 809.
Life & Casualty argues that because it relied on the assisting physician's statement (APS) submitted by Dr. Freeland on February 28, it had an "arguable reason" for denying benefits under the disability policy and thus was insulated from punitive damages as a matter of law. Bristow counters that the final APS submitted by Dr. Freeland did not give Life & Casualty an arguable reason for discontinuing benefits. Bristow points to three other APS's mailed to Life & Casualty over the preceding year, the last dated February 3, 1982, shortly before Life & Casualty decided to review the policy. Bristow further argues that the final APS was mailed directly to Dr. Freeland, instead of through Bristow, as before and that it was "deceitful."
The APS employed by Life & Casualty in this matter is a standard form consisting mainly of boxes to be checked by the physician as appropriate. Item 6a on the form is the question "is patient now totally disabled?" To the side are two sets of yes and no check boxes, one under the words "for any occupation" the other under the words "for his regular occupation." The final APS submitted by Dr. Freeland on February 28 showed that Dr. Freeland checked "yes" indicating Bristow was disabled for his regular occupation, but Dr. Freeland checked the box "no" that he was not disabled for any occupation. The final APS has a typewritten addendum asking specific questions and requiring a written response from the doctor. Number 3 under this "remarks" section has "is he disabled from all gainful occupations?" Dr. Freeland answered "no."
Margaret Lyons, who was head of the individual health claim department of Life & Casualty at the time, testified at trial that she received a memorandum on March 9, 1982, from one of her subordinates inquiring whether disability benefits to Bristow should be discontinued. Mrs. Lyons reviewed Bristow's file with her superior, William Young, the associate manager and second vice-president. On March 16, Mrs. Lyons returned the memorandum to her subordinate with the handwritten notice: "Discontinue any occup. based on dr's report per Mr. Y. (i.e., Young)" Both Young and Mrs. Lyons testified at trial that the "doctor's report" referred to here was the APS of February 28, wherein Dr. Freeland attested that Bristow was not totally disabled for any employment.
Bristow argues that the difference between the three previous APS's submitted by Dr. Freeland and that submitted on February 28 constituted a "discrepancy" which imposed upon Life & Casualty the duty of investigation before discontinuing the claim. He further objects that the typewritten addendum on the APS mailed to Dr. Freeland was "deceptive" in that it referred to "gainful" employment.
Mississippi law does indeed impose a duty upon the insurance company to promptly and fully investigate any claim. In the case of medical or disability insurance, this involves "the obtaining of all available medical information relevant to [the] claim." Bankers Life & Casualty Co. v. Crenshaw, 483 So.2d 254, 272 (Miss. 1985). In Bankers Life, an insurance company was held liable for failing to meet this standard. However, Bankers Life involved a set of facts far more egregious than the ones present here. The Court found that Bankers Life had systematically disregarded its own prescribed claims investigation procedures in Crenshaw's case. Bankers Life also involved a doctor, who was in the employ of the insurance company, who systematically ignored evidence that pointed to a conclusion other than the one he wished. In the present case Life & Casualty sought and received information from the insured's own physician. Moreover, there was undisputed testimony that during the period after the injury Life & Casualty had continually sought interviews with Dr. Freeland, without success, and that Bristow had not contacted Dr. Freeland with any additional complaint within the period. It is well settled that an insurance company is entitled to rely upon information from the insured's *624 doctor in making its decision about benefits. E.g., Blue Cross v. Campbell, supra, 466 So.2d at 840; see also O'Connor v. Equitable Life Assurance Society, 592 F. Supp. 595, 597 (N.D.Miss. 1983). As to the alleged "deceitful" wording of the APS mailed to Dr. Freeland by Life & Casualty, even if it were true as Bristow's brief asserts, that any gainful occupation would be understood to mean "any occupation for which some compensation could be paid," [which is far from apparent] the fact remains that the APS contained the same check boxes as its predecessors, and Dr. Freeland marked "no" under the question of whether Bristow was disabled for any occupation. As to the fact that Life & Casualty sent this APS directly to Dr. Freeland instead of through Bristow, we are not satisfied that it has any significance.
Life & Casualty cites the Simpson case for the proposition that punitive damage instructions should not be submitted to the jury where the plaintiff's peremptory instruction had been refused, since the refusal would indicate the factual issues to be resolved by the jury. There the Court said:
A great majority of punitive damage cases should be ended by the trial court's refusal of a peremptory instruction for the plaintiff. That is to say if the plaintiff is not entitled to a peremptory instruction, it logically follows that a punitive damage instruction should be refused. The refusal of the peremptory instruction indicates there are factual issues to be resolved by a jury and because of this it follows that the alleged tort-feasor has logical reason for denying the claim, thereby prohibiting the granting of a punitive damage instruction.
Simpson, 477 So.2d at 254.
This is not really apposite since in the case at bar, Bristow did not ask for a peremptory instruction. However, he did move for a directed verdict at the close of the evidence, and this Court has applied the same rule in that situation for the same reasons. "In the great majority of cases," this Court has held "where the insured is not entitled to a directed verdict on his underlying claim, it follows that the bad faith punitive damage issues should not be submitted to the jury." Southern United Life Ins. Co. v. Caves, 481 So.2d 764, 769 (Miss. 1985); see also Campbell, supra, 466 So.2d at 843.
We are satisfied that Life & Casualty had an arguable reason for denying disability benefits to Bristow under the policy. Even if it had not, Bristow must clear the second part of the two-part test  he must make a showing of malice, gross negligence, or wanton disregard of the rights of the insured. There is absolutely nothing in this record upon which a finding could be based. This was simply not a case for punitive damages.

WAS THE AWARD OF DAMAGES FOR EMOTIONAL SUFFERING AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
The jury's verdict of $50,000 in compensatory damages was based on a finding that Life & Casualty conduct inflicted emotional distress on Bristow.
The evidence concerning emotional distress was not voluminous. Bristow's wife, Frances, testified that after the benefits were cut off, her husband became depressed, was unable to rest and was moody and worried. Randal Thomas, a psychologist who saw Bristow for vocational rehabilitation assessment, said that Bristow was depressed and anxious to a degree that, if it were any worse, would require medical treatment. Bristow told him he was worried about finances; he had a mortgage payment due.
In Mississippi damages for mental anguish and emotional upset cannot be considered in absence of finding "an independent intentional tort separate from the breach of contract." Blue Cross & Blue Shield of Mississippi, Inc. v. Maas, 516 So.2d 495, 498 (Miss. 1987); Aetna Casualty & Surety Co. v. Day, 487 So.2d 830, 835 (Miss. 1986); Simpson, supra, 477 So.2d at 250.
In the present case, neither the pleadings nor the proof support such a finding against Life & Casualty. The counter-claim mentions both fraud and intent to *625 inflict emotional distress. However, common law fraud is not properly pleaded here since there was no allegation that Bristow relied on any representation of Life & Casualty in any pertinent manner. As to intentional infliction of emotional distress, neither of the two witnesses who spoke to this matter made even an unsupported assertion that Life & Casualty intended for Bristow to be made miserable. The testimony of Dr. Thomas does not even speak to the issue of causality at all. Dr. Thomas testified only that Bristow was depressed when he examined him. He also gave the opinion that this distress was also caused by his financial worry. He did not, however, venture any opinion as to the degree to which the benefits cut off contributed to those financial worries. In fact, it is clear from this record that Dr. Thomas never even had seen Bristow before the examination, let alone before the accident. For all he knew, Bristow might have been habitually depressed.
In short, there was no substantial evidence to support the award of damages for mental distress.
Because our conclusion on liability and punitive damages is dispositive, it is not necessary to address the other assignments of error. There being nothing in the record to support either actual or punitive damages, the plaintiff must take nothing. The verdict of the jury must be reversed and judgment rendered for Life & Casualty.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN and GRIFFIN, JJ., concur.
ZUCCARO, J., not participating.