BLUE DIAMOND, INC., Plaintiff,

v.

LIBERTY MUTUAL INSURANCE
COMPANY, Defendant.

No. Civ.A. 2:96CV372PG.

United States District Court,
S.D. Mississippi,
Hattiesburg Division.

Sept. 30, 1998.

Haynes A. Brinkley, McMahan, McMahan & Brinkley, Hattiesburg, MS, Haldon J. Kittrell, Porter, Porter & Kittrell, Columbia, MS, for Blue Diamond, Inc., plaintiff.

Clifford K. Bailey, III, Wise, Carter, Child & Caraway, Jackson, MS, for Liberty Mutual Insurance Company, defendant.

James O. Dukes, Bryant, Clark, Dukes, Blakeslee, Ramsay & Hammond, Gulfport, MS, for Sawyer Insurance, Inc., defendant.

## MEMORANDUM OPINION AND ORDER

PICKERING, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment. The Court, having reviewed the motion, the briefs, the authorities cited, and being otherwise fully advised in the premises, finds as follows, to-wit:

### FACTUAL BACKGROUND

Blue Diamond, Inc. ("Plaintiff") was involved in the oil and gas well service business. The company commenced doing business in 1989. On or about May 29, 1992, Plaintiff submitted an application for workers' compensation insurance to the Mississippi Assigned Risk Pool ("the pool"). Coverage through the pool is available to employers who cannot obtain workers' compensation insurance through the voluntary market. After being accepted, Plaintiff's application was assigned to Liberty Mutual Insurance Company ("Defendant"), which, in turn, issued Plaintiff a policy effective June 1, 1992. The policy was renewed on June 1, 1993 and again on June 1, 1994.

The premium for this type of coverage is based on payroll information provided by the employer. Since this information cannot always be projected with accuracy, the employer is billed an estimated premium at the beginning of each policy period. After the end of the policy period, the insurer conducts an on site audit of the employer's actual payroll and determines the final actual or

audited premium due for the coverage. For the policy year of 1992, Plaintiff paid a premium in the amount of $55,462.00. Plaintiff made an estimated payment of $71,495.00 for policy year 1993. The final audit revealed that the premium for the 1993 policy year was $123,370.00, leaving a deficit of $51,875.00 on the audit for the 1993 policy year (which ended in June of 1994).

The circumstances leading up to the parties' present dispute occurred in the summer and fall of 1994. In July and August, 1994, Defendant was unsuccessful in arranging an audit date for Plaintiff. According to Defendant, Neil Falk ("Falk"), an auditor from Liberty Mutual, contacted or attempted to contact Plaintiff on three occasions—once by letter and twice by phone—in order to conduct an audit for the June 1, 1993—June 1, 1994, policy period.

When the auditor's efforts to obtain an audit were unsuccessful, the auditor performed an "estimated audit" instead of an actual audit, and he sent Plaintiff an invoice containing an "estimated premium" of $161,879.00. Defendant contends that it never received a response to the initial letter or invoice, and that as a result, it sent Plaintiff a letter of cancellation advising that Plaintiff's policy would be canceled September 12, 1994 if the premium was not paid. Upon receiving the Notice of Cancellation, Plaintiff contacted representatives from the Defendant in hopes that an audit could be arranged. A meeting between the representatives of Defendant and Plaintiff was finally arranged for August 19, 1994 at the Holiday Inn in Hattiesburg, Mississippi. At the conclusion of the meeting, however, the Notice of Cancellation issue remained unresolved.

According to Plaintiff, Blue Diamond released all of its employees and ceased doing business on or about September 3, 1994 because they were uncertain about whether they had workers' compensation insurance. Between August 19, 1994 and September 12, 1994, no one at Blue Diamond attempted to contact Neal Falk or any other agent of Defendant about the status of the Notice of Cancellation.

In the instant case, Plaintiff alleges that Defendant breached its duty of good faith and fair dealing to Plaintiff in numerous ways. First, Plaintiff argues that the defendant presented it with an "improper and inflated premium" which it was unable to pay, and due to Plaintiff's inability to pay, Defendant thereafter canceled Plaintiff's workers' compensation insurance on September 12, 1994 causing it to cease doing business. Second, Plaintiff maintains that the defendant sent out a Notice of Cancellation for non-payment of the allegedly "fraudulent" premium. Third, Plaintiff contends that although Defendant's auditor conducted an audit and assured Plaintiff that the cancellation notice would be "tak[en] care of," Defendant failed to "take care of" the cancellation notice until after Plaintiff had already shut down its business operations. Lastly, Plaintiff contends that Defendant turned Plaintiff over to a collection agency for approximately $200,000.00, which included the "fraudulent" premium amount.

Defendant maintains that it has no liability to Plaintiff. According to Defendant, Plaintiff is seeking to impose liability on Defendant simply for performing its responsibilities as a servicing carrier for the Mississippi Assigned Risk Plan. Defendant argues that it followed the specific requirements and performance standards enunciated in the Assigned Risk Plan, and that as a result, it should not be subject to liability for performing its state-mandated duties and responsibilities.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The mere existence of a disputed factual issue ... does not foreclose summary judgment. The dispute must be genuine, and the facts must be material." *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*, 799 F.2d 218, 222 (5th Cir.1986). "With regard to

'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 272 (5th Cir. 1987).

To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. Once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.,* 584 F.2d 111, 114 (5th Cir. 1978). Stated another way, the nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. *See, e.g.,* Fed.R.Civ.P. 56(e), *Union Planters Nat. Leasing v. Woods,* 687 F.2d 117, 119 (5th Cir.1982).

## *LEGAL ANALYSIS*

### I. *BAD FAITH*

In Mississippi, every contract contains an implied covenant of good faith and fair dealing in performance and enforcement. *See, Cenac v. Murry,* 609 So.2d 1257, 1272 (1992); *Morris v. Macione,* 546 So.2d 969, 971 (Miss. 1989). The duty of good faith and fair dealing has been described as follows:

> In recent years, courts have often supplied a term requiring *both parties* to a contract to exercise what is called 'good faith' or sometimes 'good faith and fair dealing.' This duty is based on fundamental notions of fairness, and its scope necessarily varies according to the nature of the agreement. Some conduct, such as subterfuge and evasion, clearly violates the duty. However, the duty may not only proscribe undesirable conduct, but may require affirmative action as well. A party may thus be under a duty not only to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty, but also to take some affirmative steps to cooperate in achieving these goals.

(emphasis added). *Cenac,* 609 So.2d at 1272 (quoting Farnsworth, *Contracts,* § 7.17, 526–27 (1982)).

Stated another way, the breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness. *See* Restatement (Second) *of Contracts* § 205, 100 (1979). As noted in *Cenac,* a duty of "good faith and fair dealing" applies to "both parties" of a contractual relationship. *Cenac,* 609 So.2d at 1272.

■ In Mississippi, out of the implied covenant of good faith and fair dealing underlying every contractual agreement arises the recognition that an insurance carrier owes a duty under its insurance policy to its insureds and to the intended beneficiaries of the insurance contract. *See, e.g., Westmoreland v. Raper,* 511 So.2d 884 (Miss.1987). "When the insurer contracts with the insured, 'a special relationship of trust arises' wherein the insurer assumes a duty 'to deal fairly and in good faith with [its] insured.'" *McFadden v. Liberty Mut. Ins. Co.,* 803 F.Supp. 1178, 1183 (N.D.Miss.1992). In sum, parties to an insurance contract are expected to deal with each other in good faith and must abstain from any conduct which impairs the right of the other to receive the benefits of the agreement. A breach of this duty may give rise to an independent tort action for bad faith.

The majority of Mississippi cases relating to instances of bad faith involve failure to pay a claim, rather than the improper cancellation of a policy. It is well-settled that under Mississippi law punitive damages for failure to pay a claim may be assessed against an insurer only when the insurer denies a claim (1) without an arguable or legitimate basis, either in fact or law, and (2) with malice or gross negligence in disregard of the insured's rights. *See Dunn v. State Farm Fire & Cas. Co.,* 927 F.2d 869, 872–73 (5th Cir.1991); *Life & Cas. Ins. Co. of Tenn. v. Bristow,* 529 So.2d 620, 622 (Miss.1988); *Aetna Cas. & Sur. Co. v. Day,* 487 So.2d 830, 832 (Miss. 1986), *State Farm Fire and Cas. Co. v. Simpson,* 477 So.2d 242, 250–52 (Miss.1985). "The fact that an insurance company lacks a legitimate or arguable reason for denying a

claim does not automatically lead to the conclusion that the issue of punitive damages should be submitted to the jury." *Pioneer Life Ins. Co. Of Ill. v. Moss,* 513 So.2d 927, 930 (Miss.1987). In order to prevail, Plaintiff must also demonstrate that the insurer committed an act in disregard of the insured's rights which was laced with malice or gross negligence. *See Pioneer Life,* 513 So.2d at 930. Arguable reason has been defined as "nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to heightened level of an independent tort." *Id.* at 930. Therefore, it is clear that the "punitive-damages issue should not be submitted to the jury in cases involving an insurer who wrongfully denied a claim because of 'clerical error or honest mistake' ..." *Universal Life Ins. Co. v. Veasley,* 610 So.2d 290, 293 (Miss.1992).

Under Mississippi case law, it is the duty of courts to review the evidence in order to determine whether the punitive damage issue should be presented to a jury. *See Dixie Ins. Co. v. Mooneyhan,* 684 So.2d 574, 583 (Miss.1996). As a general rule, if there is a legitimate or arguable reason for the insurer to deny the claim, the jury should not be permitted to decide the issues of punitive damages. *See Mooneyhan,* 684 So.2d at 583. "[D]enial of a claim fails to be 'arguable' when the denial is unsupported by evidence which is sufficiently credible as to lead a reasonable insurer to deny coverage." *State Farm Mut. Auto. Ins. Co. v. Grimes,* 1997 WL 746006, at *5 (Miss.1997). The burden of proof, of course, is on the plaintiff to show that the conduct in question rises to the level necessary to justify the imposition of punitive damages. *See Veasley,* 610 So.2d at 293.

As noted, the instant dispute arose out of Defendant's attempt to audit Plaintiff's workers' compensation insurance policy for the period ending June 1, 1994 and Defendant's subsequent cancellation of Plaintiff's policy. Pursuant to Performance Standards promulgated by the Commissioner of Insurance, "Audits will be completed, billed and recorded on the company's records within 90 calendar days of policy expiration." Since Defendant was Plaintiff's service carrier, Defendant was required to audit Plaintiff's pay-roll within ninety days after the policy expired. It is not disputed by the parties that Defendant was required to complete, bill and record its final audit of Plaintiff by August 30, 1994.

The Performance Standards also provide that if an insured refuses to "allow reasonable access for audit or inspection" or "refuses to disclose the full nature and scope of the exposure," the carrier is required to initiate cancellation and notification procedures within five working days. Moreover, the Performance Standards clearly indicate that cancellation procedures may be initiated for violations of the policy provisions "if after at least two good faith attempts at contact by the carrier, one of which must be by mail, the policyholder fails to provide access to all their records." Therefore, a clear reading of the Performance Standards demonstrates that if the Plaintiff in the instant matter failed to provide "reasonable access for audit or inspection," then the defendant would conform to standard procedure by initiating cancellation procedures after two good faith attempts at contact, one of which must have been by mail. Furthermore, under section 93–101–V.1 ¶ 3 of the Mississippi Department of Insurance Regulations a carrier may cancel a policy if the insured employer does not pay premiums as due.

The first issue to be resolved by the Court is whether there is a genuine issue of material fact as to whether Defendant made a good faith effort to contact Plaintiff to set up the audit as required by applicable regulations. According to testimony given by Neal Falk, an employee of Defendant who was responsible for the audit of Plaintiff, Falk attempted to contact Plaintiff twice by telephone, and when his attempts to contact Plaintiff were unsuccessful, he sent John Dubose a letter advising him of the unsuccessful attempt(s) and requested Dubose to contact him. The letter also stated that in lieu of an actual audit an estimated audit would be issued and that the estimate could result in the cancellation of Plaintiff's current policy for noncompliance with the audit request. Falk's attempts to contact Plaintiff by telephone are corroborated by the estimated audit report which he prepared and submitted to Defen-

dant's processing center on or about July 11, 1994.[1] Plaintiff's insurance agent received a copy of the letter from Falk to Dubose. In addition, Falk's testimony that he attempted to properly contact Plaintiff is supported by Linda Bates, an employee of Plaintiff's insurance agency, Sawyer Insurance, Inc., who stated in her deposition that Falk told her that he had tried to contact John Dubose several times and had been unable to contact him and therefore was going to prepare an estimated audit.

Despite strong evidence indicating Falk's attempts to contact Dubose by phone, Plaintiff maintains that there is a material question of fact as to the efforts of Falk to contact Plaintiff prior to his issuing the estimated audit. Falk testified that he left a message with Plaintiff on one occasion and failed to get anyone on the phone in a second effort. Plaintiff argues that since it did not own an answering machine, any evidence of leaving a message must be false. However, no testimony was offered that the message left by Falk was done so on an answering machine. Instead, Falk plainly testified that he left a message with Plaintiff. He did not specify how the message was left. It well could have been left with an employee. The only way one can contact a corporation is by contacting an agent or employee. As such, lack of an answering machine does not challenge the veracity of Falk's allegations. Dubose likewise acknowledged that Falk could have "just missed somebody" as to the phone conversation as to which Falk testified that he did not get an answer.

As a result, Dubose's testimony is insufficient to establish a genuine issue of material fact as to whether Falk tried to properly contact, pursuant to the applicable regulations, Plaintiff's place of business in order to arrange an audit. Furthermore, there is no dispute that Plaintiff received Falk's letter which advised Plaintiff of the unsuccessful telephone attempts and the fact that an estimated audit would be issued.

██ Plaintiff further contends that the greatly increased premium amount charged to it by Defendant was "erroneous" and "fraudulent." According to Plaintiff, Defendant's failure to deal with their own insured in a fair way and its fraudulent actions in inflating premiums and failing to follow the appropriate Mississippi law and Performance Standards and Guidelines mandates the denial of Defendant's Motion For Summary Judgment. Plaintiff's amended complaint states, inter alia:

> As a result of Defendant Liberty Mutual charging Plaintiff improperly and by Defendant Liberty Mutual inflating the premiums amount, Plaintiff was unable to pay said premium, and Defendant Liberty Mutual thereafter canceled Plaintiff's workers' compensation insurance policy on September 12, 1994. As a result of Defendant canceling Plaintiff's workers' compensation insurance policy, Plaintiff was unable to continue with its business and was required to cease business. As a direct and proximate result of said cancellation, Plaintiff has suffered damages in the form of loss of business, loss of profits, and other damages

Plaintiff contends that Defendant breached a fiduciary duty to Plaintiff by inflating the premium amount owed by Plaintiff and presenting to Plaintiff an improper and inflated premium bill and then canceling the workers' compensation insurance policy for non-payment of the heightened premium. In light of these contentions, the Court moves to the second issue that must be decided: whether Defendant's calculation of the estimated audit using some two-hundred (200%) percent of the previous year's audit and Defendant's subsequent notice of cancellation of Plaintiff's insurance policy for failure to pay the heightened premium constitutes an act of bad faith.

Although Plaintiff maintains that an estimated audit is not provided for in the Performance Guidelines, the record before the Court indicates that it is an industry practice to issue an estimated audit prior to canceling an insured's coverage for failure to cooperate with an audit. According to testimony before the Court, the purpose of the estimated audit is to create a debit balance large

---

**1.** This document was prepared long before any of the parties had any reason to believe this matter would not be resolved to the satisfaction of all involved.

enough to encourage the policyholder to co-operate with the audit so that the actual amount of the premium owed for the prior year can be determined.

· In the instant case, Defendant does not dispute that the estimated audit it performed was based on an estimated two-hundred (200%) percent increase in Plaintiff's payroll. Instead, Defendant argues that this type of increase is a common and an accepted practice. Defendant has presented evidence that the amount of the estimate is left to the discretion of the auditor, and Jim Hathcock, the General Manager of Compensation Insurance Services, stated in his affidavit that estimates of two or three times the original estimated annual premium are not uncommon. Importantly, Hathcock is an agent for the State of Mississippi who is responsible for administering the assigned risk program.

However, Plaintiff maintains that by increasing the previous year's payroll by two-hundred (200%) percent, Defendant was in violation of its own guidelines, which, according to Plaintiff, limit the auditor's estimate to twenty-five (25%) percent to one-hundred (100%) percent increases. Yet, upon close examination of the applicable guidelines, it is apparent that the auditor is allowed a great deal of discretion when determining the percentage by which he will perform his audit. As a matter of fact, the guidelines do not expressly limit the auditor's estimate to less than one-hundred (100%) percent increase. On the contrary, in select situations, the guidelines provide that the estimate can be an one-hundred (100%) percent "or more increase to make the debit substantial enough to initiate a response." According to the defendant's guidelines, "The amount of the estimated premium will be determined by the Auditor using judgment based on the situation at hand. Generally, *but not exclusively,* the ... guidelines should be considered." (Emphasis added). As such, the percentages used for an estimated audit are largely based on the auditor's discretion.

Furthermore, Jim Hathcock, who is responsible for making sure that carriers comply with the applicable standards, stated that "issuing an estimated audit based on a multiple of its estimated annual premium is a standard industry practice and is permitted by the servicing carrier's Performance Standards." Although Defendant has presented evidence demonstrating the adequacy of its actions, Plaintiff has presented no evidence, other than conclusory allegations, to support its allegation that the practice of issuing an estimated audit is in violation of the MARP's Performance Standards. It therefore cannot be said that the estimate provided by Defendant was "erroneous."

Nor can it be said that the estimate was "fraudulent." By completing the audit, Falk was trying to create a sufficient debit balance to encourage Plaintiff to comply with Defendant's request for an audit, not to perpetuate a fraud. As already noted, after Defendant's initial attempts to contact Plaintiff failed, Defendant sent a letter to Plaintiff which read, "In lieu of an actual audit, an *estimated audit* will be issued." (Emphasis added). According to the venerable Black's Law Dictionary, "estimate" is defined as "A valuing or rating by the mind, without actually measuring, weighing or the like. A rough or approximate calculation only." *Black's Law Dictionary* 550 (6th ed.1990). This definition of the word "estimate" coincides with the common-sense understanding of the word, which, of course, is not indicative of an actual or concrete amount. An estimated amount, unlike an actual amount, is subject to change. This fact was clearly communicated to Plaintiff in an itemized Estimated Audit Adjustment which expressly stated, "This estimated invoice is subject to revision when the policyholder's records are made available to audit by a representative of [Blue Diamond]." Therefore, Plaintiff had knowledge, or should have had knowledge, that the amount requested by Defendant was an estimate and subject to substantial alteration. Even so, Plaintiff failed to take any action which could have quickly remedied the precarious situation. Had plaintiff simply provided the requested documents, this matter would have been concluded. However, no evidence has been offered that Plaintiff attempted to provide the documents until after the notice of cancellation had been presented to Plaintiff. Moreover, Plaintiff could have paid the estimated invoice amount and would have subse-

quently been entitled to a refund. Even more readily, Plaintiff could have called Defendant and made some inquiry after his meeting with Falk at the Holiday Inn. Instead, Defendant's requests and notices were met with inaction Thus, in light of the above, it cannot be said that Defendant's actions were "fraudulent." Defendant's actions did not delineate an intent to deceive. To the contrary, the Court finds that Defendant's actions were in compliance with the applicable regulations and otherwise adequate in light of the circumstances.

The cases reviewed by this Court involving the question of bad faith relate to alleged bad faith on the part of insurance companies, not bad faith of insureds. This Court has observed that when the threat of punitive damages is removed (e.g., ERISA cases) insurance companies often adopt positions and take actions that would otherwise subject them to claims of bad faith and punitive damages. The Court, however, has also observed a tendency on the part of insureds and their attorneys to endeavor to build or set up bad faith claims. In the opinion of this Court, it is just as reprehensible for an insured to fail to deal fairly with the insurer as it is for the insurer not to deal fairly with the insured. Plaintiff, as an insured, cannot manipulate the law to create a sword for bad faith damages or to create a defense of a legitimate debt. Mississippi law not only requires good faith on the part of the insurance company, *it also requires good faith and fair dealing on the part of the insured.* "Both parties" share a corresponding duty *Cenac*, 609 So.2d at 1272.

After reviewing the record, this Court concludes that the insurer did not act in bad faith under the particular circumstances of this case. Additionally, the Court concludes that Plaintiff's conduct was not entirely in good faith. The Court would note that the law in general and the law respecting bad faith does not require the abandonment of common sense. This Court instructs every jury over which it presides that the jury should not abandon common sense and reason in determining what the facts are or are not in any given case. Courts likewise should not ignore common sense in applying legal principles and deciding the law as to a particular case.

In considering the entire record of this case, the following is evident. Defendant had no choice but to insure Plaintiff under the assigned risk program of the State of Mississippi. Defendant, under applicable law, was likewise required to audit the payroll records of the Plaintiff. It is apparent that Defendant contacted Plaintiff to arrange this audit on two occasions, and Plaintiff made no response until after Defendant advised that the policy would be canceled. Ordinarily, audits are conducted at the place of business where all the records are available; but instead, in this instance, Plaintiff requested that the audit be conducted at a motel where all of the records were not available. Although there is a dispute as to what took place at this meeting, it is undisputed that Plaintiff acknowledged that he could not pay the difference in the previous premium paid and the premium that was now going to be due. Defendant contends that the auditor, Falk, reported back to the sales force to contact Plaintiff and try to sell him a policy outside the assigned risk program. The record indicates that Defendant's agents made this attempt, but they were not able to contact Plaintiff, and Plaintiff took no further action to contact Defendant to see whether he did or did not have insurance. Although there is some dispute about what took place or what was said by Falk and Dubose at this meeting, regardless even the alleged actions of Falk did not escalate to a level of bad faith.

The record clearly indicates that Plaintiff took the drastic action of closing his business and laying off his employees without any further contact with Defendant. *In light of Plaintiff's previous disregard of efforts to obtain the audit,* it cannot be said that the actions Defendant took were contrary to the law or in bad faith. Defendant could have canceled Plaintiff's policy either for failure to pay a premium (which admittedly was due) or for failure to cooperate in allowing Defendant to make the audit required by law. The record conclusively establishes that Plaintiff's actual damages, if any, were of Plaintiff's own making and thus there is no genuine

issue of material fact. A plaintiff cannot disregard its own duty to deal in good faith and then, when Defendant acts because of Plaintiff's failure to carry out Plaintiff's own responsibility, bring a bad faith action against Defendant. That is what happened in this suit. Consequently Plaintiff's claim for bad faith and for actual damages will be dismissed.

## II. LIBERTY MUTUAL'S COUNTER-CLAIM

■ Liberty Mutual ("Defendant/Counter–Claimant") has also filed a counterclaim against Blue Diamond, Inc. ("Plain tiff/Counter–Defendant") for the total amount of $54,-965,00.

According to Defendant/Counter–Claimant, when it did get the information it needed to complete its audit of the 1993 policy, it was determined that the estimated premium paid by Plaintiff/Counter–Defendant from June 1, 1993 to June 1, 1994 was inadequate. Defendant/Counter–Claimant contends that the final audited premium for the year was actually $123,370, which was $51,875 more than the amount originally estimated to be $71,495. In sum, it is alleged that Plaintiff/Counter–Defendant owes an additional $51,875 as a result of the final audit for the 1993 policy year. In addition, Defendant/Counter–Claimant claims at least $3090 in additional premiums for the period that the policy was in force between June 1, 1994 and September 12, 1994.

Nonetheless, although the plaintiff/counter-defendant admits that it owes the defendant/counter-claimant some money for premiums due under the policy period of June 1, 1993 to June 1, 1994, it argues that the underwriting file which contained all the necessary information for arriving at the above figures has been destroyed, and that consequently, there is no proof to substantiate that the $51,875 plus the additional premium of $3,090 is the amount actually owed. However, the defendant/counter-claimant contends that the underwriting file has not been destroyed and that the only documents not available are the personal notes, extra copies of correspondence, and various other documents which may have been maintained only in the field auditor's file. According to Defendant/Counter–Claimant, any significant information obtained by their auditor, Falk, was submitted to them in his audit reports and are still available.

After a exhaustive review of the record, it is clear that Plaintiff/Counter–Defendant was provided full workers' compensation coverage during the June 1, 1993 to June 1, 1994 time period. Furthermore, it is evident that additional premiums are owed by the plaintiff/counter-defendant for coverage through September 12, 1994. As a matter of fact, Dubose admitted in his deposition that the plaintiff/counter-defendant was provided full workers' compensation coverage during this time period and that the additional premiums due for the extended coverage under the policies have not been paid. Colette Viola, a Senior Accountant for Liberty, verified the amounts requested by Defendant/Counter–Claimant in her deposition. Defendant has therefore produced proof of its claim for a minimum of $54,965.00.

Plaintiff/Counter–Defendant's mere assertion that it disputes the amount owed, without more, is insufficient to create a genuine issue of material fact. No evidence has been offered by Plaintiff/Counter–Defendant that additional information is needed to calculate the amount of premiums due. In sum, no basis has been alleged for challenging the claimed amounts due by Defendant/Counter–Claimant. There are no genuine issue of material facts to be determined. As a result, the defendant/counter-claimant is entitled to judgment as to its counter-claim of $54,965.00.

**For the reasons stated above, Defendant's Motion for Summary Judgment against Plaintiff is GRANTED. Defendant/Counter–Claimant's Motion for Summary Judgment on its Counterclaim against Plaintiff/Counter–Defendant is also granted.**